**GEORGIA KAOLIN COMPANY**
*v.*
**UNITED STATES of America.**
**No. 16377.**

United States Court of Appeals
Fifth Circuit.

Nov. 8, 1957.

Motions to Modify Opinion and for

Rehearing Denied Jan. 9, 1958.

John B. Harris, Jr., John B. Harris, Macon, Ga., Harris, Russell, Weaver & Watkins, Macon, Ga., of counsel, for appellant.

Frank O. Evans, U. S. Atty., Macon, Ga., Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Atty., Fred W. Smith, Atty., Washington, D. C., Floyd M. Bu-

ford, Asst. U. S. Atty., Macon, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

Proceeding under an enabling statute,[1] appellant, the lessee of mineral rights under a lease from the DeFores, which by its terms expired on February 16, 1950, brought this suit to recover the damages it claimed to have suffered as a result of the failure of the United States, which had held possession of the property under a lease expiring June 30, 1946, to re-deliver the property to it on that date.

The claim was that, because of the failure of the United States to re-deliver the property and its continuing failure thereafter so to do until in March, 1947, plaintiff "was compelled in order to secure any benefits from said lease to said valuable clay lands, to negotiate with its lessors for an additional lease and * * was compelled to pay additional and larger sums for royalties" to plaintiff's damage in the amount sued for.

The United States replying with a motion to dismiss the complaint for failure to state a cause of action and joining issue in an answer denying plaintiff's allegations and claims, the cause went to trial before the court without a jury. At the conclusion of the oral evidence, which, except for the brief testimony of one witness for the government, consisted mainly of the long drawn out and to an extent argumentative testimony of appellant's president and that of its general manager, the district judge, on full findings of fact and law, concluded that, while the proof showed that the United States had breached its obligation to re-deliver the property and had wrongfully held over, plaintiff had not sustained its burden of establishing that it had sustained the damages for which it sued or any actual damages, and was, therefore, entitled to recover only nominal damages

1. Public Law 730, 80th Congress, Act of June 19, 1948, 62 Stat. 566.

in the sum of $1.00. Pursuant to these findings and conclusions, a judgment was entered for plaintiff for said sum.

Appealing from the judgment, appellant is here insisting that the district judge entirely misapprehended the nature and effect of the evidence which plaintiff offered in its behalf; that his findings of fact were therefore clearly erroneous; and that his judgment may not stand.

Appellee, on its part, taking a directly contrary view, urges upon us that the district judge was right throughout, that indeed no other judgment could have been entered.

On the facts [2] established without dispute and for the reasons hereafter brief-

2. These may be summarized as follows:

On Feb. 16, 1925, W. F. DeFore and his wife executed a mineral lease for 25 years on 237 acres of land in Twiggs County, Georgia. It provided for payment to the DeFores of a royalty of 10 cents per ton of kaolin mined and a minimum royalty of $100 a year chargeable against earned royalties. By a series of transfers appellant acquired this lease on Nov. 29, 1937. In 1939 appellant test drilled the property and on that basis it was estimated the tract contained 645,900 tons of kaolin.

In the summer or fall of 1940, the City of Macon entered into negotiations with the appellant to acquire, for the purpose of transferring them to the United States for use as a military camp (Cf. Georgia Kaolin Co. v. U. S., 5 Cir., 214 F.2d 284), leases of various lands owned by appellant in fee and on which appellant held mineral leases. At that time no mining on the DeFore tract had been done but it was considered a valueable leasehold and was being held as part of appellant's reserves.

In view of the fixed termination date of appellant's leases from the DeFores, Feb. 16, 1950, and the uncertainty of the time of military occupancy by the United States, appellant was concerned in these negotiations to have the DeFore lease extended for the period of military occupancy, and this concern was made known to representatives of the City of Macon and to representatives of the United States for whose use the lands were being leased. Representatives of the City, but not of the government, assured appellant that the City would procure an extension of the DeFore lease for five years, but though bona fide efforts were made along these lines by the City and some of its citizens, such efforts proved fruitless.

By a lease dated October, 1940, appellant leased to the City of Macon various lands owned or under lease to it, including the DeFore tract, which lease, as extended by supplemental agreement, expired June 30, 1946. The rights of the City under this lease were transferred to the United States.

Upon termination of hostilities in the fall of 1945, appellant set on foot efforts to obtain a re-entry in view of the fact that its lease with the DeFores would expire on Feb. 16, 1950, but these efforts were unavailing, indeed the property was not returned on June 30, 1946, the Government contending that decontamination was not complete. Appellant was, however, allowed to enter the property in December, 1946, and it conducted stripping operations until January 28, 1947, when it was required by the Government to cease its operation in order that further decontamination operations be undertaken, and it was not until March 18, 1947, that appellant was finally assured that the property had been fully decontaminated and it was allowed to go on the property and carry on mining operations as fully as it desired.

In February, 1947, however, determining to seek an extension of the DeFore lease, appellant opened negotiations with the DeFore heirs, nine in number, and on June 18, 1947, three months after it had been permitted to go back on the property, secured a new lease ending Feb. 16, 1960. This abrogated the terms of the original lease and provided a royalty rate of 18 instead of 10 cents per ton and a minimum royalty rate of $50 per month for each interest outstanding, or $450, the tonnage figures (royalties) to be credited against this minimum royalty. These new terms became effective as of July 1, 1947, and continued to Feb. 16, 1960. Prior to execution of this lease, appellant had acquired a $\frac{2}{9}$ undivided interest in the fee and subsequently acquired an additional $\frac{1}{9}$ undivided fee interest.

A mine was opened in 1947 but only 119,000 tons had been mined from said property at the time of the trial.

Appellant claimed damages in its original complaint in the amount of $53,876.-00, and in its amended complaint in the amount of $185,000.00. During the trial, however, the demand was reduced first

ly stated, while we agree with appellant that the district judge was wrong in his conclusion:

> "This Court cannot agree with plaintiff, however, in its contention that such damages as it here claims (or such as it would claim the right to claim, but for the new lease) were within the contemplation of the parties, or either of them, when this lease was signed."

we agree with appellee that he was right in holding:

> " * * * The burden rests upon the plaintiff to establish by a preponderance of the evidence both that it has sustained damages and the amount thereof."

and in finding and holding upon a careful examination and summary of the evidence that plaintiff had failed to produce any showing that it had been damaged by the acts complained of and that it was therefore entitled to recover only nominal damages.

Striking hard at these findings, appellant points to the testimony of its president, that, while there were several factors which entered into the decision to seek an extension of the DeFore mineral lease, the major factor was the economic one, viz., that it was deprived by the action of the United States of that much time taken out of its lease "and my duty was to minimize the damage by trying to reduce it some other way",[3] and to the opinion he gave that the 8⅓ months delay caused by the government had made it difficult, indeed almost impossible, without higher costs, to get all of the clay out within the time remaining. So pointing, it insists: that, upon this evidence and the authorities holding that one who is injured by the wrongful or negligent acts of another is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damages and that the injured party may recover for expenses incurred in reasonable efforts to prevent or minimize his damages,[4] plaintiff was entitled to the recovery sought; and that the findings and conclusions of the district judge to the contrary were clearly erroneous.

The appellee pointing to the discursive, inconclusive, argumentative, and, to an extent, not wholly consistent nature of the testimony of plaintiff's president and chief witness, extending over more than 200 pages of the transcript, particularly to his testimony as to the situation he found himself in when, after Mr. Chestney's death, his hopes sunk on getting an extension of the lease which he had all along been hoping to get, he found himself confronted, at first with the problem of getting the clay off before his mineral lease expired even if the government should release it in June, 1946,[5] and later with the even more difficult problem

to $34,448.00, and finally to $24,759.50, the basic claim being the increased royalty of 8 cents per ton less an allowance of a cent and a half because of more efficient operation under the longer lease, and the method of computation being the number of tons estimated at 645,000 multiplied by the increased royalty, 8 cents per ton, less allowances for appellant's one-third fee ownership, together with an admission by appellant's president that a saving of a cent and a half of this increase would result from more efficient operation under the new lease.

3. He further testified, "Instead of getting excited about it and spending a lot of money, I thought we should find out how much it was going to cost to renew that lease so you can weigh that against the extra cost that would be involved in get-

ting it out, and according to our records it was Feb. 26, that the first effort was made in accordance with my instructions of '47."

4. 15 Am.Jur., Damages, Sec. 27, pp. 420, 423, and Sec. 147, pp. 554–555.

5. On cross examination, on page 364 of the record, in answer to the question:

> "Well it was to a certain degree disadvantageous to you to get in there and mine like the dickens to get it all out under your type of operation in the period of time that you had left, even if you had gotten in there on June 30, it would have been a disadvantageous thing for you to have done?"

he replied:

> "If we couldn't get the lease renewed, yes."

when the government retained possession of the property after the lease expired and did not surrender it until some eight months thereafter, urges upon us that the controlling issues determined by the judge were fact issues and the record fully supports his findings that plaintiff's proof failed to make out a case for the recovery of the damages it sued for.

We agree with appellant that, *though it did not sue for or prove the amount of damages it actually sustained as the natural and probable result of being deprived of a part of its lease time by being compelled either to purchase an extension of the lease for the 8⅓ months lost or to mine it at a higher cost with the probability of leaving some of the clay unmined,* it could nevertheless recover if it had made satisfactory proof: (1) that if it had not obtained the new lease it would have been damaged in at least the amount of its claim; (2) that it took the new lease not because of the advantages and benefits it conferred but in an effort to minimize the losses it would have otherwise sustained; and (3) that in doing so it acted with reasonable care and prudence.

We agree with appellee, however, that the district judge was right in holding that the plaintiff did not make such proof. Indeed, when the evidence and the court's findings with respect to it are reviewed in the light, of plaintiff's attitude toward and use of this lease over the long period of years it has had it as a part of its mineral "reserve", its manifested desire at all times to obtain a renewal or an extension of it rather than to mine it, and of the evidence as a whole showing the great advantages it obtained by securing the new 13 year lease, we think it plain that the record furnishes the fullest support to the findings and conclusions of the district judge, that plaintiff neither made the requisite proof of the damage, if any, sustained by it as a result of the 8⅓ months holding over, nor established as it was required to do, that appellant's act in obtaining the lease was not a voluntary one taken for its own benefit and advantage but an involuntary one which, in the exercise of reasonable and prudent efforts to minimize the damages resulting to it from the holding over, it was compelled to, and did, take.

The judgment is, therefore, affirmed.